Good morning, Your Honors, and may it please the Court, Richard Sprinkle on behalf of Jeremy Esteves, the appellant in this matter. Your Honor, I have reserved five minutes for rebuttal. Your Honor, Jeremy Esteves was denied his right to a constitutionally protected fair trial when the FBI entered into tacit agreements with its confidential informant, Jamal Hurst, and it failed to disclose the quantity, the nature, and the extent of those conversations and discussions with Mr. Esteves' defense. Now the record here is clear. Agent Rays made multiple tacit agreements with Hurst where Rays agreed to speak with AUSA McMahon and others regarding Hurst's cooperation and regarding the fact that Hurst desired assistance from the government with state charges in exchange for that cooperation. Now those agreements were not previously disclosed to Mr. Esteves, but became abundantly clear during evidentiary hearings that occurred after the last time this Court remanded this matter back to the District Court. Can I, are you only challenging the suppression of the recorded phone calls on appeal? Have you forfeited any challenge to the other categories of alleged exculpatory evidence? Well, Your Honors, we don't believe that we forfeited that because that was raised in the previous appeal anyway, and this Court found that those items were material, although the District Court said, assuming favorability and suppression, those matters were not material before. This Court already found the issues were material as to Mr. Esteves' and remanded it back. Now during the evidentiary hearings, we find that the recorded jail calls in particular led to the discovery of these tacit agreements. So these calls are really important, but you think that the universe is still before us? We believe the universe— You previously said they were material, the other— Yes, Your Honor. We believe the universe of the other categories is still in play, although the bulk of our brief, this go-around, and our reply brief, talks about what happened because of the recorded calls, which shows the importance that those recorded calls should have been turned over in advance so that Mr. Esteves' team could have ferreted out these tacit agreements in the first place. There's no disputing Agent Reyes did what we're arguing, that he made these tacit agreements. His exact words were, I made empty promises to a C.I. to string him along. And then Agent Reyes also admits to telling AUSA McMahon about this. So we've got a government agent making these agreements, agreements that were not disclosed under GIBLIO. We've got a United States prosecutor who's aware of these discussions and has not disclosed them under their obligation. Even under Augers, they're required to disclose this stuff without even the defense requesting it. So we've got an issue here. Now, the first thing the court can look at is, was a tacit agreement actually made? But this court's already answered that question in Tassin v. Kane. A tacit agreement is present if that witness believes that the government is actually in a position to implement any promise of consideration. Now, we know that Hearst believed he could get some help because in trial testimony, Hearst said he hoped somebody would go help him. He hoped somebody would reach out to the authorities in Baton Rouge with some of his state charges and assist with that. So it's clear that he believed the help was possible or he wouldn't have been hoping for that help. So we know a tacit agreement exists. Now the only question left for this court is, does that tacit agreement, knowing it exists, fall under Brady? So we look at the elements of Brady. This court's seen it hundreds of times, I'm sure. Did the government suppress favorable evidence that was material to the questions of guilt or punishment? Well, we know it was suppressed because it was never turned over. It took an evidentiary hearing after a previous appeal, after motions for a new trial. It took considerable litigation just to get to these tacit agreements and find them. They weren't the type of evidence that the defense could have found through reasonable discovery methods. They were not the type of evidence that could have been found through really any amount of due diligence because these agreements existed only in three places and those were the minds of Agent Stephen Reyes, AUSA Mike McMahon, and Jamal Hurst. They were clearly suppressed and they're clearly favorable because while the government's going to argue this is just cumulative suppression evidence where Jamal Hurst was already suppressed, the government's missing the point here. Its agent could have been impeached as well. Agent Stephen Reyes sat right on the witness stand in front of the district court judge at the evidentiary hearing and said, I did these things. I made tacit, excuse me, his exact words were, I made false promises. I strung him along every time I talked to him. And the government in its brief argues that the agent didn't make any promises. It's on page 18. In the same sentence, they say he made false promises and then he didn't make promises. They can't have it both ways. Now the issue here is not whether or not the government felt like it immunized itself by saying we were never going to live up to these promises. I was never going to actually try to get this man out of jail. Agent Reyes said that he and McMahon discussed the matter, didn't want Jamal Hurst out of jail because they felt he was safer there. Of course, the obvious other reason is he will keep continuing to cooperate while he's in jail. That doesn't matter. The only thing that matters is what was in Hurst's mind. Did he believe the government was going to help? So again, the tacit agreement exists. It was suppressed and it was favorable. So we questioned whether it was material because that's what got us here in the first place. Were the recorded calls that led to these tacit agreements, were they material? Well, Your Honor, we would believe as these agreements are the fruit of those calls that they would be material in that regard. But just analyzing the tacit agreements on their own, are they the type of information that if they were disclosed to the defense, is there a reasonable probability that the outcome of the trial would have been different, according to Bagley? And we know that a reasonable probability exists when the, excuse me, a reasonable probability is one sufficient to undermine outcome in the verdict. Well, clearly, if the defense had an opportunity to further undermine the testimony of Hurst, that would have been beneficial. What do you mean when you say further undermine? You had an opportunity to undermine it. And Your Honor, they did. They're used in cooperating with law enforcement. They did. They knew he gave them information. They did. And so you're saying they just didn't know enough not to trust him. Your Honor, it could be the difference between explaining to the jury that he made a few little white lies or he made some big lies. And then further, it would also give us the opportunity to have impeached the agent, which would have led to a whole litany of further discussion on the stand. So it's clear that this was material to the question of guilt and or punishment when it comes to Jeremy and Steve's. And it's clear that the government suppressed this item. It's favorable, this item being the tacit agreements. And for that reason alone, Brady seems to have been violated here. There's really no other common sense approach to this. The government had a witness who was bought and paid for. And the jury heard that. And the jury heard that. The jury heard how he had worked for the government multiple times. So this is all on the record. Not only has the jury heard it, but now this court sees it. And now this court also sees the tacit agreements that were going on behind the scenes. So the government can't say, pay no attention to the man behind the curtain. He's been exposed. The truth is hiding in plain sight here. The tacit agreements occurred. The tacit agreements were never disclosed. Hearst believed in the tacit agreements. And the problem with those tacit agreements is the possibility for deception. As the Supreme Court stated in Bagley, the fact that the government's willingness to seek leniency for a defendant isn't necessarily guaranteed, but was expressly contingent on the government's satisfaction with the end result, serves only to strengthen any incentive to testify falsely in order to scare conviction. So here you have a man being told, I'm going to see what I can do. Just keep working with me and I'm going to see what I can do. Agent Reyes specifically said that he would make his wishes known to the U.S. Attorney's Office, and if they could intercede or, you know, try and get you some better deal, then maybe they would. That's in the government's brief, not mine, on page 29. It's also found in the record at 5406. And that's exactly what Agent Reyes did. He did talk to the AUSA Hearst. And we also know by the record that at some point somebody from the government's office did send a letter to the East Baton Rouge District Attorney's Office saying that Jamal Hearst cooperated. We're well aware of that. As a matter of fact, also in the record, there is a statement made in the Baton Rouge Court Minutes for the 19th JDC where the ADAs thanked him for his previous cooperation with the government. So we know that that happened. The government just can't have it both ways and say he made false promises, but he didn't make promises. We clearly see the material value of those phone calls because look what they led to. Can you explain it, just two or three sentences, the materiality? The materiality of the tacit agreements? Yes. Well, the materiality of the tacit agreements, evidence, again, is material if it looks to the questions of guilt or punishment. So here we have an FBI agent making these agreements. Had a jury heard that, it further questions how reliable is Hearst's testimony when Hearst is sitting on the stand and knows that what I say can have a bearing on what kind of assistance I can get. And also gives questions to the veracity of the statements of the agent on the stand when he's testifying to what he uncovered in his investigation. This is the kind of thing that the fact finder should have seen. Talk about the materiality of the calls now. I'm sorry, Your Honor? Talk about the materiality of the calls now. The materiality of the calls were never given to the defense prior to trial. Now, we know from, I believe it's U.S. v. Pollack, that information needs to be given to the defense in a reasonable amount of time so that they can prepare defense for it. And even if that means it has to be a pretrial disclosure, it has to be able to be used effectively. This stuff was dropped on the court in the middle of trial. The defense moved for a new trial or mistrial. That was denied. However, the defense accepted a continuance from, I believe it was Thursday afternoon to Tuesday morning, so they could have a chance to listen to the calls and then work from that. Well, agreed, that gave them time to listen to the calls. But clearly that didn't give them time to ferret out this other information that came about through the evidentiary hearings. That would have required... Did you renew your motion for a continuance? Frankly, Your Honor, I'm not sure if the defense renewed that motion or not. I was not present for the trial team. To be clear, I'm not sure if that was renewed or not. But ultimately, this court already noted previously that even though Hearst was thoroughly impeached at trial, that doesn't end the inquiry, because this court agreed with the district court that there is a significant difference in the degree and kind between the benefits Hearst testified about at trial and the benefits revealed by this undisclosed evidence. This court already made that statement, and this court further held that while some of Hearst's testimony was corroborated, it can't say that it was all strongly corroborated. So that takes away the government's argument that, oh, well, the mountain of evidence against Jeremiah Steeves would have made this immaterial. That's not the case. This court already remanded on materiality. And the items that were remanded on materiality, those calls, led to these tacit agreements, which... There's no other way to say it. All of the case law, all of the jurisprudence leads to those being impermissible. If you just ran down the entire list, and I'm not going to bore the court with my entire analysis and rule synthesis here, but you go through Giglio, you look at Bell v. Bell that says even unwritten tacit agreements need to be discovered, you conduct your materiality and your favorability analysis, you see that it's suppressed, you know that from this court and where he became, all attempts from a witness to obtain any sort of relief from the government need to be disclosed. It wasn't disclosed. We know the duty to disclose encompasses both exculpatory and impeachment evidence. We know the prosecution's got a duty to turn this stuff over, regardless of whether or not it was even asked for. Your Honor, there's just no way the government can escape the fact that the rules were broken here. So, okay, we remanded to determine whether the government suppressed the new evidence. You remanded on the question of suppression and favorability. Right, but we said the district court did not consider whether government suppressed the new evidence, so we remanded the district court to consider this prong in the first instance. Yes, Your Honor. And tell me how the record shows that that is satisfied. Well, the actual testimony of Agent Reyes, starting on the record around page 5400, you have Agent Reyes and you have Assistant United States Attorney Mike McMahon. Their testimony brings to light the tacit agreements. The tacit agreements were ferreted out because of the dialogue in the phone calls, which were the things that got remanded back. Because the agent knew of the tacit agreements, it doesn't matter whether the phone calls were subpoenaed or not. I'm not sure I understand the question. The government suppressed evidence. We're trying to determine, did the government suppress? The government suppressed the phone calls, certainly. We didn't find out about those until mid-trial. Well, they said they didn't know about it or that you could have gotten them. There were some in the wrong place, apparently. They argue that, that you didn't know about it. I mean, that they didn't know about it and that they weren't suppressed because you could have subpoenaed them. But just taking the phone calls completely out of the equation and I'm going to talk fast because I've got ten seconds Taking the phone calls completely out of the equation the phone calls led to these tacit agreements which were suppressed by the government. Nobody was aware of those until these evidentiary hearings. So, clearly, suppression occurred. So there was clear suppression and then favorability. Yes, Your Honor. And then materiality as well. No, but do favorability. We already have materiality from the first appeal. I'm trying to see on remand if the court had done what we had asked to be done do you prevail on the elements of the Brady claim? We absolutely prevail, Your Honor. What is the favorability? What is the evidence that the favorability is there? Favorable evidence regards two things. Either evidence that's exculpatory or evidence that can be used to impeach a government's witness. Specifically in this case? Specifically we could impeach agent Stephen Reyes and specifically we could further impeach Jamal Harris. So you believe the record on the remand establishes suppression and establishes favorability and therefore you should be prevailing on your Brady claim? Absolutely, Your Honor. We believe the record wholly supports that. Certainly. So are you saying that the recordings you said they led to the tacit agreement? Specifically, yes, Your Honor. It's not just that they're evidence of a tacit agreement it's the phone calls that led to tacit agreement. In the phone calls, Jamal Harris I know he asked his mom to talk to the agents Sure, sure. He said talk to the agents they can help him. So now you're saying she talked to them and they made more agreements with them. Agent Reyes' testimony indicates that he spoke to both Orinda Placide which is Jamal Harris' mother and Jamal Harris himself. He didn't particularly like talking to Jamal Harris personally because exact words were I don't want to talk to him because he'll say something crazy that I have to report. But occasionally he did talk to Jamal Harris according to his own testimony and every time he did he gave him false promises and strung him along. Did he do that with the mother too? He admits to doing that as well in the record, Your Honor. Thank you. Thank you, Your Honor. May it please the court I'm Megan Roberts for the United States. This case is whether the government suppressed seven jail calls between confidential informant Jamal Hearst and his mother in May and June 2019 when he was detained on a probation violation in Texas. And I just want to clarify that because counsel referenced some calls that came up during trial where there had been a continuance. Those calls are not what we're discussing here today. The phone calls that we're talking about are seven phone calls that were between Jamal Hearst and his mother. And that's the transcripts that are in the record. Is this case also about suppression of the tacit agreements? Well the tacit agreements is what he is referring the counsel is referring to is conversations that Jamal had with his mother. No, the tacit agreements are not with the mother they're with the agent. The suppression of agreements between the agent, isn't it the case not just about the calls but about agreements being suppressed that the agent actually had tacit agreements, said he did and they were fake ones. So, fake tacit agreements. Right, so what came out in the evidentiary hearing and why this case was remanded back was that there had been conversations in those seven phone calls that alluded that Jamal Hearst believed that he was going to be helped out. And that's true. He had a good reason to believe that because he had these fake tacit agreements with the agent. And I was on the panel so I'm very familiar with this case. Go ahead, I'm sorry. Sure, so at the evidentiary hearing after hearing testimony from Agent Reyes and Agent Elmer and AUS McMahon, all of that was more robustly developed than the last time that this case was before a panel. And what came out of the two-day evidentiary hearing, the district court did find the testimony of Agent Reyes credible, found the testimony of AUSA McMahon credible, and during that evidentiary hearing, there were comments made about empty promises and strung along. But that was heavily explored by the district court and the district court asked repeatedly what he meant by that. Things that came out is that Agent Reyes said multiple times that he did not have the authority to make any promises to anyone and that he said that repeatedly to Hearst that he didn't have the authority to make any promises on behalf of anyone and also told that... He was also making promises. He said that he would pass along to the government that he was cooperating and in fact he did pass that along to the government and Hearst testified about that at trial that he had... He was trying to create the impression that he could get him the help so that he would cooperate. He was sitting in jail in Texas and if you look at the tenor of his phone calls with his mother he wanted to get released. He in my sentence was the agent. Sure, the agent. Agent Reyes spoke to Hearst twice spoke to the mother three times and each time he said I'll take your request, your wishes and I will pass those along to the US Attorney's Office. He didn't have any authority to promise to get him out that he would pass along. Whether he had authority or not he was trying to create the impression that he could do something so that he could string him along literally. When the district court asked what did you mean about stringing him along Agent Reyes said he was calling me every day. I wasn't picking up the phone. A couple times I did pick up the phone I was just saying yeah, I'll let him know. It's an unfortunate choice of words that he used in the evidentiary hearing because I think honestly what was happening there is that he was blowing Jamal Hearst off and he was blowing Jamal Hearst's mother off because they were calling him and wanting some type of cooperation. That was what Jamal Hearst had done consistently throughout the few years he got picked up by law enforcement. He would volunteer to try to provide information he wanted to talk to law enforcement to cooperate and that all came out in the trial that any time he was picked up by law enforcement he wanted someone to call him and I think one thing that comes out in those seven calls is if he had a tacit agreement with Special Agent Reyes and he knew that he had it, if you look at the seven calls he had with his mother he's saying things like call anyone you know, tell them I need help call Agent Elmer, tell them I need help Agent Elmer in 2019 had already been retired from the FBI since 2016 so the calls actually show that he was just wanting to talk to anyone to try to get anything done and a lot of that came out at trial So in any event the questions on remand were suppression and favorability so explain how the remand does not establish suppression and favorability we're not assuming argumento that we're not dealing with materiality again because we already did materiality but just assume that argumento and tell how this would establish suppression and favorability Well the district court after a two day hearing and listening to all the testimony made credibility determinations and factual determinations and after listening to all of that determined that even though Hearst may have thought he deserved favorable treatment or that he hoped he would receive favorable treatment there was no testimony that actually established that there were any additional promises that weren't already brought out in trial the district court also went through so for suppression What is that go to? That goes to the suppression that there was nothing to be suppressed that hadn't already been brought out at trial and I do want to point out about the waiver issue is that the district court in its 30 page decision noted that Steeves didn't actually address specifically the other four categories of evidence and the district court did go through each of those and said that none of them had been suppressed for various reasons and I can go through each one of those So the calls were not suppressed The calls were not suppressed because there was nothing in them showing that there was an agreement. There was nothing in there showing That's not whether they were suppressed or not. That's about whether they're material or favorable I mean that's not suppression So why is that suppression? They are either suppressed or not. Were they given over? That's what suppression means So were they suppressed? Just looking at the basics of what suppression is and what should have been turned over Those seven phone calls were never heard by the government The government didn't have it in its possession and it were phone calls at the Brazorio detention center in Texas and none of those employees, detention center employees were on the prosecution team So just taking it to the basics those phone calls were not in our possession They were not something that the prosecution had at the time of trial and could have handed over at that time The district court went on to say that there was nothing from those seven phone calls that even showed any excavatory or relevant evidence that should have, that we should have known about that should have been turned over And the other So you believe they were not suppressed, the calls Was the information about the agent having these calls and stringing the mother along suppressed? I'm sorry, could you repeat that question? Was the information about the agent stringing the witness Mr. Hearst and his mother suppressed? Well that came out in the evidentiary hearing. Was that suppressed? That was not suppressed Well it would be suppressed because the agent would know it and have a duty to tell the prosecutor. The agents who's helping do the case at the time would know the information Was that information that should have been Was that suppressed? It was not suppressed because that all came out in trial when they did the direct examination of Hearst and they also did a cross examination of Hearst and they asked him about I didn't think it all came out at trial I thought it came out in the evidentiary hearing later. Well what came out in the evidentiary hearing later is when Agent Reyes used the term empty promise and string along to describe his communications with Hearst just because he used that language doesn't mean that we were aware that there was a promise there's nothing in the record that suggests there was a promise He said I'll pass along to the U.S. Attorney's Office you cooperated and he did and at trial Hearst was asked what are you hoping from this and he said I was told if I cooperated that something could happen and indeed a letter was sent a letter was sent after trial to the East Baton Rouge District Attorney's Office informing them that he was an essential witness in this conviction was obtained and so everything that was brought out in trial, every promise that was here was before the jury Not just actual promises though but were the false promises suppressed because the agent had knowledge of them at the time of the original trial and those did not come out at the original trial. The false promise being I'll let the U.S. Attorney's Office know you cooperated and then they can decide how they're going to assist you and how the U.S. Attorney's Office assisted Hearst in what came out in trial is that they wrote a letter to the East Baton Rouge basically telling the state about his assistance and Hearst testified that that's the expectation he had so that did come out at trial I would like to just briefly discuss the materiality finding. Can we do favorability first? Sure, absolutely. Because that's the actual thing it was remanded for. Right. It was remanded for suppression and favorability so I think we should cover those things besides instead of the thing it was not remanded for. Sure. For favorability the district court did not make any findings on favorability How is that? The district court stopped its analysis at suppression So it just said suppression is not established so we need not go into favorability? Correct. Yes. Do you concede that favorability would be established on this record? Yes. We would say That's helpful. Yes. For favorability things that would come forward absolutely would be favorable but even if they were favorable we do argue that they are not material and the record that's before this court today is very different than the record that was before this court the last time that a panel looked at it because what we have now is a more robust record. In its materiality analysis in the last time in Brumfield this court talks about the government's promise for leniency in exchange for testimony would be more powerful impeachment evidence than the mere possibility of a favorable outcome and then it went back for a two day evidentiary hearing. So when we had this case before it was strictly on the papers. There was no factual determinations there were no credibility determinations and now we have that But we didn't ask for that That was not what the case was remanded for The case was remanded for suppression and favorability. It was not remanded for a redo of materiality. Was it? The mandate was not remanded to do that. Although to do a two day of evidentiary hearing and to take the testimony and to make credibility determinations it's a different landscape than the last time this court looked at it and I don't know how that doesn't come into play when you look at a materiality because the last time this case was before this court it was strictly on the papers. It was sort of Right. And we determined that it should go back for something else. We didn't say it's reopened on that We didn't say you should do a total scorched earth and we're going to have a do over on the thing. We said we're remanding it on the two other elements of Brady. And I think what had come out of the evidentiary hearing is what the court in Brumfield thought existed but there wasn't anymore. I think we would concede yes, materiality. But what came out of the evidentiary hearing was the district court looking at every piece of that evidence and asking, did you ask you know, ask AUSA McMahon ask Agent Reyes ask Agent Elmer, did you call this state law enforcement agency and ask that he could have a more favorable disposition. Every single time they answered no, no, no and no. That's new information that wasn't before this panel the last time we were up here. And then as far as also looking at We didn't authorize new information on this point. But that went to suppression to understand what even existed. And so that's what the purpose of the evidentiary hearing was. It's the government's position that if we were not to look at materiality because we had already determined materiality and that's the law of this case, assuming argument though, that you still win because suppression is not established? Yes. We still win that suppression is not established. Okay. Thank you. Thank you. You can keep arguing. That was just my question. Okay. Well I'll just make it real quick if there aren't any further questions. One thing that did come out in the evidentiary hearing and counsel kind of talked about this a little bit having to do with Hearst's testimony and the evidence of the case. One thing that Agent Reyes did that came out in the evidentiary hearing is that they tried to do other methods to corroborate his testimony and that even taking Hearst out of the testimony out and just looking at the evidence of the case that there were other things there that supported that testimony that Hearst gave at trial such as Cedric Wade's testimony. There was also other testimony about money that was found in a search warrant. There was a search warrant that supported his testimony and so I just wanted to make that point since counsel had mentioned that. We already said that Wade's testimony doesn't talk about the Tahoe's driver and it's not enough. We already said Wade's testimony is not enough. Didn't we say that in the Brumfield case? Isn't that verbatim from the Brumfield case? You said that it didn't seem like taking that out and whether or not it would be enough and I just wanted... You said it's not enough. Didn't we? You said that it was thin. You said some of the evidence was thin in the Brumfield case. I just thought that with Agent Reyes testifying a little bit more about that they tried to find other ways to corroborate his testimony so that even taking that out you do have some things that if you do take out Hearst's testimony from that it doesn't mean that there isn't any evidence in the record. If there are no further questions I guess I'll just make one more point though before I sit down and I know we talked a little bit about the materiality finding and I know how the court feels about that. I'm just one person. Sure. And so I do just have one more point to make with the materiality finding. If this court chooses to relook at it based on the evidentiary hearing and the finding from that and that is that if you look at United States v. Perry what really came out in that case is that this court has found suppressed impeachment evidence to only be material when it changes the tenor of a witness's testimony even though the witness has been impeached on other grounds and I think that United States v. Perry does play a part in here because even looking at these phone calls it really is cumulative of what was brought out at trial and he at trial the direct examination and the cross-examination of Hearst went on for a very long time. A lot of stuff came out at trial. He testified about his criminal history at the time of trial he was in custody at the East Baton Rouge Paris Detention Center he was testimony was brought out about that at that time he admitted to cooperating with the Secret Service and the credit card fraud and that he had received benefits of a phone and money he talked about receiving a cell phone and moving expenses when he cooperated with the FBI about giving information about the robbery he even admitted at that time that he called Agent Elmer when he was picked up for shoplifting to provide information about Brumfield so all of that came out yes and what also came out is that one of his major motivations to testify and to be there at trial is that he hoped to get a Crime Stoppers award which he did get that came out in the evidentiary hearing that he did receive like a portion of that award and so all of that came out in a very long direct and cross-examination of Hurst so even looking at these other phone calls it all wouldn't really change the tenor of what really was brought out at trial and so that's one of the reasons why we would argue that the phone calls were not material and I'm happy... How do you distinguish the Lacaze case? Sure the Lacaze case well in the Lacaze case you had a witness who said that he you had a witness testify that he had asked over and over again that his son not be prosecuted and that the prosecutor gave him an assurance that he would not, that his son would not be prosecuted and also what came out is that the witness later on I believe in an evidentiary hearing said that he probably would not have given his statement at trial or his statement about the case had he not received the assurance that his son would not be prosecuted so that's very different than what we have here there weren't assurances for his testimony he was just told if you were to cooperate we might be able to send you know so very different than what happened here. You had a witness in Lacaze saying I would not have done X if I had not received this assurance and that's not what occurred here alright if there are no further questions thank you so much thank you your honors first I'd like to correct my own earlier argument a little bit in my haste this morning and excitement I did get my phone calls confused the calls that we were specifically discussing were in fact the ones that AUSA just mentioned they were the ones that came about well after trial they came out through another one of the defendants attorneys but the fact of the matter is those calls led to these tacit agreements and I completely agree with the government that agent Reyes testimony was credible at the evidentiary hearing he did in fact make tacit agreements he did make false promises and he did string his case along and when the judge stopped the questioning to when judge Afric stopped the questioning to specifically ask wait a minute the important thing here is what he understood meaning Hurst so the judge was touching on the USV Devorin and Lacaze case from this court already about what's really important is what's going on in the mind of that witness and we know what went on in the mind of the witness we know he believed he was going to get help that's why he hoped he would we know that the witnesses and his mother were calling non-stop they were asking for help again agent Reyes fully credible however we know that those calls were not discussed according to I believe it's Weary V. Cain where any attempts of the witness to try and get assistance need to be disclosed is it just cumulative though? it could be considered cumulative towards Hurst but it's not cumulative towards Reyes this all implicates Reyes in the tacit agreement as well it takes two parties to make a contract at minimum so this is not cumulative towards Reyes this would certainly be favorable towards Reyes this court asked numerous questions about favorability and suppression I think we've established suppression I feel like that horse has been beat to death but favorability is when you can impeach a government witness with the information and here we can impeach not one but two witnesses two witnesses whose testimony helped convict favorability and they don't concede suppression so perhaps the horse is not quite dead well if they've conceded favorability your honor and this court's already put materiality aside as the law of the case there's no representation made of that but suppression they said they didn't have them so they couldn't have disclosed them and had no duty to give them whether they disclosed the calls or not has no bearing on whether or not they disclosed the tacit agreements that an agent knew darn well he made and an agent passed on to the prosecutor so he knew they existed they can't hide behind that they can't say this is a case where they didn't have knowledge they can claim all day long they didn't know about these phone calls but what they did know about was what those phone calls were discussing they cannot hide behind that your honor so the question still is was this a fair trial considering the government withheld favorable and material evidence he said it in his own words in his testimony he said to Hurst I'll see what I can do and he had those discussions with McMahon that Hurst is cooperating Hurst wants help the two of them talked about whether or not they would let Hurst out of jail they agreed that they shouldn't because he would be safer in jail or perhaps the issue is he may run I'm sorry your honor sure but what the jury didn't hear were the links Reyes went to I'm sorry your honor you think they didn't know he was talking to Reyes they knew the jury may have known he was discussing things with Reyes but he did not know tacit agreements existed he didn't know that Reyes was stringing him along if the jury knew that Reyes was potentially lying to its own witness in order to elicit testimony then it's perfectly reasonable to think that the outcome of this trial would have been different it's impossible to believe it any other way if the jury knew because he lied to his C.I. so he's lying to the jury now exactly that's the way impeachment works that's the way impeachment works if a witness is impeached as to one thing then we have to call all their testimony into question so if agent Reyes is on a witness stand and he gets impeached as to his credibility when he's talking to a witness who he's supposed to be getting truthful information from then what's the jury to think it's only reasonable to think that that information could have changed the tenor of this trial and if Reyes is a liar what is it that he would have been lying about that would help your case the fact that he would have been making false promises to a witness in order to pull information out of him would show the fact that this government agent may bend the rules and we may not have gotten a fair trial out of the deal what was his significance in the trial I'm sorry your honor what was the significance of agent Reyes testimony in the trial agent Reyes was the lead investigator on the case his significance was of great importance this court has already said the other evidence against the Steves was my word is shaky enough that materiality seems to be in question and that's why it remanded in the first place so now if we were to take away the lead investigators testimony because he's impeached again it's perfectly reasonable to believe that the outcome of the trial would have been different and there's a reasonable probability that we should consider the verdict to undermine in this case thank you and I'm out of time your honor thank you